UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

DAVID NOURACHI, as Trustee empowered
to buy, sell, encumber and manage real
property of the HW 44 Lakefront Trust, a
Florida Land Trust under F.S. 689/071
dated 12/8/02,

                     Plaintiff,

-vs-                                      Case No.  5:08-cv-70-Oc-10GRJ

UNITED STATES OF AMERICA, VILLIE M.
SMITH, Marion County Property Appraiser,
MARION COUNTY, FLORIDA,

                     Defendants.
_____

# O R D E R

This quiet title action is before the Court for consideration of Defendant United States of America's Motion for Summary Judgment (Doc. 28), to which the Plaintiff has filed a response in opposition (Doc. 36).  Upon due consideration, and for the reasons discussed below, the Court concludes that the motion is due to be granted in part and denied in part.

## Undisputed Facts and Procedural History

The case revolves around a parcel of real property located in Marion County, Florida. The Plaintiff, David Nourachi, Trustee of the Highway 44 Lakefront Trust, contends that he is the owner of the property, which he purchased through a tax sale in December, 2002. The United States contends that it obtained ownership of the property through a deed conveyance in 1937, and that the property is part of the Ocala National Forest.

The original survey of the land at issue was conducted in May 1849, and was approved by the United States General Land Office on October 16, 1849. (Doc. 35, Ex. 1). The survey described the land as Fractional Section 20, Township 15 South, Range 25 East,[1] and delineated the meander lines of Lake Bryant.[2] (Id.). Section 20 was separated into six Government lots. Government Lot 1, containing 58.76 acres, and Government Lot 2, containing 35.89 acres, are the lots involved in this litigation. The western boundary line of Government Lots 1 and 2 was the high-water line of Lake Bryant.[3]

The United States General Land Office conducted a dependent resurvey of Section 20 in 1929, which was approved on February 23, 1932. The dependent resurvey reestablished the boundaries of the original survey, using the best information currently available. Even though the east meander line of Lake Bryant had changed position from 1849 to 1929, the high-water line of Lake Bryant remained the  western boundary line of

---

[1] A "full section" of land consists of a square mile, and normally contains approximately 640 acres. When a section contains less than 640 acres, it is called a "fractional section." South Florida Farms Co. v. Goodno, 94 So. 672, 675 (Fla. 1922).

[2] "Meander lines are run in surveying fractional portions of the public lands bordering upon navigable rivers, not as boundaries of the tract, but for the purpose of defining the sinuosities of the banks of the stream, and as the means of ascertaining the quantity of the land in the fraction subject to sale, and which is to be paid for by the purchaser." St. Paul and Pacific R.R. Co. v. Schurmeier, 74 U.S. (7 Wall.) 272, 19 L.Ed.2d 74, 78 (1868). In situations where a body of water exists, it is undisputed that the water line, and not the meander line, controls the actual boundary of the fractional section. Id., South Florida Farms, 94 So. at 675.

[3] Lake Bryant is also known as Mill Dam Lake and Half Moon Lake, and all three names are used at various times in the relevant deed and title documents.

Government Lots 1 and 2. The northeast corner of Government Lot 2 as established on both the original and dependent surveys is the point of intersection between the east meander line of Lake Bryant (*i.e.* the high-water line), and the West 16th line (the sub-divisional line that serves as the boundary line between Lots 1 and 2).

## II.    The Chain of Title

Over the last 70 years, the property at issue has gone through a series of transfers and conveyances, leaving a somewhat convoluted paper trail. By deed dated July 9, 1935, J. M. Meffert and his wife Nancy A. Meffert, and L. W. Duval and his wife, Addie H. Duval, conveyed all of Government Lots 1 and 2 of Section 20, Township 15 South, Range 25 East, to C. A. Savage, Jr., and his wife, Dorothy R. Savage. The deed was recorded in the Marion County Official Record Book on July 11, 1935.

By deed dated January 19, 1937, C. A Savage, Jr. and Dorothy R. Savage conveyed the following property to the United States:

> Government Lot One (1), that part of Government Lot Two (2) East of the East meander line of Lake Bryant more particularly described as follows:   From the northeast corner of Section Twenty (20) run West along the North Boundary of Section Twenty (20), Township Fifteen (15) South Range Twenty-Five (25) East, Fifty-eight and Fifty hundredths (58.50) chains, thence South One Degree (1°) Forty-five minutes (45') West Eleven (11.00) chains, thence South Thirty-One degrees (31°) West Four (4.00) chains to point of beginning at the North boundary of Lot Two (2), thence due South Twenty (20.00) chains, thence South Forty-eight degrees (48°) Thirty minutes (30') West Eight (8) chains, thence North Thirteen degrees (13°) Fifteen minutes (15') East four and two tenths (4.2) chains, thence North Thirty-four degrees (34°) West Four and Ninety hundredths (4.90) chains, thence North Eight degrees (8°) Thirty minutes (30')

3

West Six and Fifty hundredths (6.50) chains, thence North Thirty-five degrees (35°) Fifteen minutes (15') West Five and Thirty hundredths (5.30) chains, thence North Twenty-eight degrees (28°) East Three and Ten hundredths (3.10) chains, thence North Fifty-four degrees (54°) Twenty minutes (20') East Three and Ninety hundredths (3.90) chains, thence North Forty-nine degrees (49°) East Four and Six hundredths (4.06) chains, thence South Sixty-nine degrees (69°) Forty-five minutes (45') East Four and Forty hundredths (4.40) chains to point of beginning as above described . . . .

(Doc. 29-4).

The deed was recorded in the Marion County Official Record Book on January 23, 1937.

On July 3, 1939, Charles F. Miller conveyed all of his "right, title, and interest in all that part of Government Lot Two (2) lying West of the East meander line of Lake Bryant" to C. A. Savage, Jr. The deed was recorded in the Marion County Official Record Book on October 24, 1939. The United States is not asserting title to any portion of Government Lot 2 situated west of the east meander line of Lake Bryant.

By deed dated August 8, 1975 and recorded the same date, C. A. Savage, Jr. conveyed to his wife, Dorothy R. Savage

Government Lot 2 in Section 20, Township 15 South, Range 25 East and also all filled-in lands that have been added thereto EXCEPT those parts thereof that have been previously sold and conveyed by recorded deeds of conveyance made by Grantors to various persons, and which are now of record in the public records of Marion County, Florida.

(Doc. 29-6). By deed dated September 13, 1982 and recorded on October 1, 1982, Charles A. Savage, Sr., T. Wayne Gale, Alan C. Gale, and John S. Gale conveyed this

4

same property to Charles A. Savage, Jr., also known as Charles A. Savage, III.  (Doc. 29-7).[4]

On September 29, 1988, Charles A. Savage and Charles A. Savage, Jr. conveyed the following property to Broderick Building Corporation:

PARCEL NO: 4

Beginning at the point of intersection of the North right-of-way line of State Road 40 and the West boundary line of Section 20, Township 15 South, Range 25 East; thence Northerly along said West boundary line to the existing mean high water mark or line of Mill Dam Lake (sometimes called Lake Bryant); thence Easterly and Southerly along and with said existing mean high water mark or line to the North right-of-way line of State Road 40; thence Westerly along said right-of-way line to the point of beginning.  Being a part of Government Lot 2 of Section 20, Township 15 South, Range 25 East.  Tax Assessor's Parcel # 3285-000-004.

PARCEL NO: 5

Beginning at the point of intersection of the South right-of-way line of State Road 40 and the West boundary line of Section 20, Township 15 South, Range 25 East thence Southerly along said West boundary line to the existing mean high water mark or line of Half Moon Lake (sometimes called Lake Bryant); thence Easterly and Northerly along and with said existing mean high water mark or line to the South right-of-way line of State Road 40; thence Westerly along said right-of-way line to the point of beginning.  Being a part of Government Lot 2 of Section 20k, Township 15 South, Range 25 East.  Tax Assessor's Parcel # 3285-000-004.

---

[4]There is no record of how or when the property was conveyed to Charles A. Savage, Sr., T. Wayne Gale, Alan C. Gale, and/or John S. Gale.

This deed was recorded in the Marion County Records Book on October 7, 1988. (Doc. 29-8). On January 25, 1990, Broderick Building Corporation conveyed these two parcels to Judith C. Broderick. (Doc. 29-9). On October 22, 1992, Judith C. Broderick conveyed the parcels to Mill Dam Corporation. (Doc. 29-10). On April 11, 1994, Mill Dam Corporation conveyed the two parcels to Edwin J. Kasanders, Jr., and Edwin J. Kasanders, III. (Doc. 29-11). Each of these conveyance deeds was properly recorded in the Marion County Official Records Book.

On April 20, 1999, a quitclaim deed from Charles A. Savage, Jr. to Edwin J. Kasanders, Jr. and Edwin J. Kasanders, III was recorded in Marion County for the following land:

> PARCEL NO: 4
>
> Beginning at the point of intersection of the North right-of-way line of State Road 40 and the West boundary line of Section 20, Township 15 South, Range 25 East; thence Northerly along said West boundary line to the existing mean high water mark or line of Mill Dam Lake (sometimes called Lake Bryant); thence Easterly and Southerly along and with said existing mean high water mark or line of the lake and a canal to the North right-of-way line of State Road 40; thence Westerly along said right-of-way line to the point of beginning. Being a part of Government Lot 2 of Section 20, Township 15 South, Range 25 East.
>
> PARCEL NO: 5
>
> Beginning at the point of intersection of the South right-of-way line of State Road 40 and the West boundary line of Section 20, Township 15 South, Range 25 East thence Southerly along said West boundary line to the existing mean high water mark or line of Half Moon Lake (sometimes called Lake Bryant); thence Easterly and Northerly along and with said existing mean high

6

> water mark or line of the lake and a canal to the South right-of-
> way line of State Road 40; thence Westerly along said right-of-
> way line to the point of beginning. Being a part of Government
> Lot 2 of Section 20k, Township 15 South, Range 25 East.

(Doc. 29-12). It is unknown why this quitclaim deed included the description of a canal.

The quitclaim deed also only referred to the tax parcel numbers as "3285-000-001 and

others."

III.    Nourachi's Claim to the Property

In late 2002, Marion County determined that the ad valorem taxes for the following

property had not been paid for the tax years 1995 and 1996:

> SEC 20 TWP 15 RGE 25
> THAT PART OF GOVT LOT 2
> N OF SR 40 & E OF CANAL

Accordingly, Marion County determined that the property should be sold at a tax sale.

Notices of the sale were sent to several individuals, including Charles Savage, Jr., and

Charles Savage, III, and the notice of the tax sale was published in the Ocala Star-Banner

on November 5, 12, 19, and 26, 2002. Marion County did not send any actual notices to

the United States.

On December 18, 2002, the Clerk of the Circuit Court for Marion County, Florida sold

the property to Nourachi as Trustee of the Highway 44 Lakefront Trust for the amount of

$ 22,600.00. Nourachi received a tax deed for the property that same day. (Doc. 29-13).

The land conveyed to Nourachi consists of approximately 10.58 acres, and is located on

that portion of Government Lot 2 between the east high-water line of Lake Bryant, the western boundary line of Government Lot 1, and the north side of State Road 40.[5]

Nourachi subsequently brought a quiet title action for the property in the Circuit Court, Fifth Judicial Circuit, In and For Marion County, Florida, against Charles A. Savage, Jr., a/k/a Charles A. Savage, III, and his heirs, grantees, successors, creditors, assigns and others. The circuit court awarded final default judgment quieting title to Nourachi on February 10, 2004. (Doc. 29-14). The United States did not receive actual notice of the quiet title action and was not served in the case.

IV.   The Current Title Dispute

In mid-2003, Harold G. Shenk, a Forest Ranger with the United States Forest Service, learned that Marion County had issued a tax deed to Nourachi for the 10.58 acres of land in Government Lot 2. Shenk made contact with the Marion County Property Appraiser's Office in July 2003, provided the Office with a copy of the 1937 deed from C. A Savage, Jr. and Dorothy R. Savage, and ultimately convinced the Property Appraiser's Office that the property conveyed to Nourachi in the tax deed belonged to the United States. On October 20, 2005, the Marion County Property Appraiser changed its property assessment rolls to clarify that the United States owned the property.

While the Marion County Property Appraiser's Office was looking into the United States' claim to the land, the United States Forest Service contacted Nourachi directly in

---

[5]See Deposition of Larry Efird, Jr., dated January 29, 2009, Ex. D (Doc. 37-2).

an effort to resolve the situation. On March 9, 2004, Jerri Marr, District Ranger for the United States Forest Service wrote to Nourachi and explained that the land on the north side of State Road 40 just east of Mill Dam Lake in Marion County "has been a part of the Ocala National Forest since January of 1937 when [the United States] purchased the tract from C. A. Savage, Jr. under the Weeks Act of 1911."[6] Marr also requested that Nourachi immediately remove the "no trespassing" signs Nourachi had posted on the property.

In response to this letter, Nourachi asked Osama "Sam" Zalloum, a private real estate consultant hired by the Highway 44 Lakefront Trust, and Haythem Nourachi, the Plaintiff's brother, to contact the Marion County Property Appraiser. On March 10, 2004, Zalloum and Haytham Nourachi met with Marion County Assistant Property Appraiser Cathy Cavalier and Director of Assessments Donna Minchew at the Marion County Property Appraiser's Office. There is a dispute over what was said at that meeting. Cavalier and Minchew testified at their depositions that they told Zalloum and Haytheam Nourachi that the property deeded to the Plaintiff at the tax sale was actually the property of the United States and should not have been sold.[7] Zalloum testified at his deposition that no one at the Property Appraiser's Office mentioned a claim on the property by the

---

[6]See Deposition of David Nourachi, dated November 30, 2007, Ex. 1 (Doc. 37-4). Nourachi contends that this letter did not put him on notice of the United States' claim to the property because the letter did not contain any legal description of the land, a tax parcel identification number, or a copy of any deed or other form of conveyance. See Deposition of Sam Zalloum, dated November 30, 2007, p. 46 (Doc. 37-3).

[7]See Deposition of Cathy Cavalier, dated November 20, 2007, pp. 18-19, 70-71 (Doc. 29-20); Deposition of Donna Minchew, dated November 20, 2007, pp. 14-15, 17 (Doc. 29-21).

United States, or that Marion County intended to change the owner of the property to the United States.[8]  According to Zalloum, the only issue discussed at the meeting was the potential removal of the "no trespassing" signs.[9]

The record does not establish whether there were any further communications between Nourachi or any of his representatives and the Marion County Property Appraiser's Office until April 19, 2006, when Nourachi learned from the County's website that the owner of the property had been changed to the United States.  On that date, Nourachi wrote to the Marion County Property Appraiser asking it to change the name of the owner of the property from the United States back to Nourachi, and attached a copy of the December 2002 tax deed and tax bill.[10]

The Property Appraiser's Office wrote back to Nourachi on April 24, 2006 and explained that the United States was claiming title to the property.  On June 2, 2006, Ginger Giuliani, Deputy Tax Collector, wrote to Nourachi and refunded to him the ad valorem taxes paid on the property for the 2005 tax year.  In that letter, Giuliani explained that the Marion County Property Appraiser had changed the ownership of the land to the United States on October 20, 2005, and directed Nourachi to contact Marion County's tax

---

[8]See Deposition of Sam Zalloum, dated November 30, 2007, pp. 60-63 (Doc. 37-3).

[9]Id.  In August 2004, Nourachi obtained title insurance for the property in the amount of $550,000.  Id., Ex. 10.  Nourachi increased the policy at some point thereafter to $1,300,000.  Id., Ex. 9.

[10]See Deposition of David Nourachi, dated November 30, 2007, Ex. 4 (Doc. 37-4).

collector attorney if he had any further questions.[11]  It does not appear that Marion County has ever refunded to Nourachi the purchase price for the property.

V.    This Action

Nourachi initiated this action by filing a complaint in the Fifth Judicial Circuit, in and for Marion County, Florida, on December 15, 2006 (Doc. 1).  He did not serve the United States of America until January 23, 2008.  On February 15, 2008, the United States removed the case to this Court (Id.) pursuant to 28 U.S.C. §§ 1346(f), 1441, and 1442(a)(1).

On May 12, 2008, Nourachi filed a Revised Amended Complaint, (Doc. 18), asserting three claims against the Defendants: (1) a claim to quiet title against the United States (Count I); (2) a claim for slander of title against the Marion County Property Appraiser (Count II); and (3) a claim of negligence against Marion County (Count III). Nourachi seeks either a decree from the Court that he is the owner of the property, or to quiet title to him for any portion of the property that the United States is deemed to own. In the event the Court holds that the property is owned entirely by the United States, Nourachi requests recovery of the purchase price for the property, plus interest and costs.

VI.    The Competing Surveys

In response to Nourachi's lawsuit, the United States contracted with a surveying company, GCY, Inc., to prepare a boundary survey for Government Lots 1 and 2, and in

_____

[11]Id., Ex. 5.

particular, to determine the boundaries of the property deeded to the United States in 1937. GCY used the original 1849 survey and the 1932 dependent resurvey, a September 1936 Forest Service acquisition plat, as well as the legal description set forth in the 1937 deed to calculate the boundaries for the property.[12]  GCY determined that while the exterior corners and boundary lines of Section 2 had been located and delineated on the prior surveys, the interior lot lines and corners of Section 20 were never actually located on the ground.  Instead, the interior lot lines and corners had been delineated on the prior surveys through a process known as "protraction" - whereby the lines are merely extended and drawn on the survey as dashed lines by the draftsman.  Protraction lines are not final until actually surveyed.  As a result, GCY had to resurvey the land itself and find boundary lines for the first time.

Through its interpretation of the prior survey materials, and its own surveying of the ground, GCY determined that the point of beginning of the property deeded in 1937 was the northeast corner of Government Lot 2, that the eastern boundary line of the property coincided with the line dividing Government Lots 1 and 2, and that the western boundary of the property was the east meander line - the high water line or shore line - of Lake Bryant.[13]  In other words, the United States contends that this GCY survey demonstrates that it owns all property going up to the shore line of Lake Bryant, even if such land did not

---

[12]See Declaration of Scott A. Bannerman, PSM (Doc. 29-23).

[13]See Declaration of Scott A. Bannerman, PSM (Doc. 29-23).  See also Doc. 35, Ex. 18.

exist in 1937, but was created over the past sixty (60) years through accretion or reliction.[14]

The United States has also submitted the declarations of two designated experts: James David Coleman, Forest Land Surveyor for the Forest Service, United States Department of Agriculture, and Michael O. Lange, Regional Land Surveyor for the Forest Service, United States Department of Agriculture. Both Coleman and Lange aver that the GCY survey is an accurate representation of the land conveyed to the United States in the 1937 deed, and is consistent with the 1849 and 1932 surveys.[15]

Nourachi also hired a surveyor, Larry Efird, Jr., to determine the boundaries of both the property conveyed to the United States in 1937, as well as the property Nourachi purchased at the December 18, 2002 tax sale. Using the 1849 and 1932 surveys, the legal description from the 1937 deed, and conducting his own survey of the grounds, Efird determined that the boundaries for the property deeded in 1937 were markedly different from those drafted by GCY.[16] Using the courses and distances description set forth in the 1937 deed, Efird determined that the western boundary of the United States' property did

---

[14]"'Accretion' means the gradual and imperceptible accumulation of land along the shore or bank of a body of water. 'Reliction' or 'dereliction' is an increase of the land by a gradual and imperceptible withdrawal of any body of water." Board of Trustees of the Internal Improvement Trust Fund v. Sand Key Associates, Ltd., 512 So. 2d 934, 936 (Fla. 1987). There is no expert testimony or other evidence in the record supporting the apparent position of the United States that over 10 acres of land could be created by accretion between 1932 and 2009.

[15]See Declaration of James David Coleman (Doc. 29-24); Declaration of Michael O. Lange (Doc. 29-22).

[16]At the time of his deposition, Efird had not completed his survey of the property. Nourachi has not submitted the completed survey to the Court.

not reach to the high water line of Lake Bryant, but instead was several acres west of the Lake's shore line. Efird also determined that the land conveyed in the tax sale was located north of State Road 40, west of the boundary line between Government Lots 1 and 2, and east of the shore line of Lake Bryant, and that this land was not part of the 1937 deed conveyance.[17] Efird further pointed out that the point of beginning utilized by GCY in its survey was not accurate and, if followed, would substantially reduce the land actually conveyed to the United States in 1937.[18]

## Summary Judgment Standard

Pursuant to Federal Rule of Civil Procedure 56(c), the entry of summary judgment is appropriate only when the Court is satisfied that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In applying this standard, the Court must examine the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits and other evidence in the record "in the light most favorable to the nonmoving party." Samples on Behalf of Samples v. Atlanta, 846 F.2d 1328, 1330 (11th Cir. 1988). As the Supreme Court held in Celotex Corp. v. Catrett, 477 U.S. 317 (1986), the moving party bears the initial burden of establishing the nonexistence of a triable issue of fact. If the movant is successful on this

---

[17]See Deposition of Larry Efird, Jr., dated January 20, 2009, pp. 67-72, Exs. D, F (Docs. 37-2, 39).

[18]Id., pp. 74-75, 77-78, 90-91. Nourachi has not designated Efird as an expert witness, but instead intends to rely on him as a fact witness only. The United States has recently filed a motion in limine (Doc. 41) seeking to strike Efird's testimony and his survey, which the Court will address when it becomes ripe.

score, the burden of production shifts to the non-moving party who must then come forward with "sufficient evidence of every element that he or she must prove." <u>Rollins v. Techsouth</u>, 833 F.2d 1525, 1528 (11th Cir. 1987). The non-moving party may not simply rest on the pleadings, but must use affidavits, depositions, answers to interrogatories, or other admissible evidence to demonstrate that a material fact issue remains to be tried. <u>Celetex</u>, 477 U.S. at 324.

## **Discussion**

### I.    <u>The Quiet Title Claim</u>

The United States argues that it is entitled to summary judgment on this claim by virtue of the 1937 deed, which the United States interprets as conveying all property in Government Lot 2 located from the eastern shore line of Lake Bryant to the boundary line separating Government Lots 1 and 2. The United States reaches this conclusion by relying on the language in the 1937 deed which states that the land being conveyed is "that part of Government Lot Two (2) East of the East meander line of Lake Bryant more particularly described as follows," and by interpreting the subsequent courses and distances description as merely providing additional detail on the conveyed land.

The interpretation of a deed, including the legal description of the boundaries set forth in the deed, is a question of law for the Court to resolve. <u>See</u> <u>Mitchell v. Moore</u>, 13 So. 2d 314, 317-18 (Fla. 1943); <u>Board of Trustees of the Internal Improvement Trust Fund v. Lost Tree Village Corp.</u>, 805 So. 2d 22, 24 (Fla. 4th DCA 2001). <u>See</u> <u>also</u> <u>In re Club</u>

Associates, 951 F. 2d 1223 (11th Cir. 1992).[19] However, where the deed is ambiguous on its face, extrinsic evidence may be examined to determine the intent of the parties at the time the deed was created. See American Quick Sign, Inc. v. Reinhardt, 899 So. 2d 461, 465 (Fla. 5th DCA 2005). See also Barnett v. Destiny Owners Ass'n, Inc., 856 So. 2d 1090, 1092 (Fla. 1st DCA 2003) ("Language in a document is ambiguous when it is uncertain in meaning and may be fairly understood in more ways than one and is susceptible of interpretation in opposite ways."); Lemon v. Aspen Emerald Lakes Assocs., Ltd., 446 So.2d 177, 180 (Fla. 5th DCA 1984) ("It is a well-established legal principle that if a written contract is ambiguous so that the intent of the parties cannot be understood from an inspection of the instrument, extrinsic or parol evidence of the subject matter of the contract, of the relation of the parties, and of the circumstances surrounding them when they entered into the contract may be received in order to properly interpret the instrument.").

The Court concludes that the 1937 deed is ambiguous on its face because the legal description of the property conveyed to the United States is capable of more than one interpretation. On the one hand, the 1937 deed can be read to convey all property from the eastern shore line of Lake Bryant east to the boundary line separating Government Lots 1 and 2, and that the subsequent courses and distances description is merely providing further detail concerning the conveyed land. On the other hand, the deed can

---

[19]It appears that the Parties agree that Florida law applies to the interpretation of the 1937 deed.

be read to mean that the United States received only <u>that portion</u> of the land east of the eastern shore line of Lake Bryant that is more particularly described by the courses and distances language.

The United States argues that the courses and distances language should be disregarded under the well-settled tenant that when a deed describes the boundaries of a parcel of land by using both natural and/or artificial monuments (such as water lines or boundary lines), as well as by courses and distances (such as chains and minutes), the description utilizing the monuments prevails. <u>See</u> <u>Brooks v. Pryor</u>, 189 So. 675 (Fla. 1939). However, this is not such a case. Even by focusing solely on the phrase "that part of Government Lot Two (2) East of the East meander line of Lake Bryant more particularly described as follows" it is not readily clear that the conveyance was meant to run from the shore line. The words "that part" and "more particularly described" can be read both to mean only a specific section of the land east of the eastern shore line of Lake Bryant, as well as the entire portion of the land starting from the shore line and going east.

Because the deed's description of the conveyed property is ambiguous, it is appropriate for the Court to consider extrinsic evidence to determine the intent of the parties at the time of conveyance. The only evidence submitted by the United States which goes to this point is a Forest Service acquisition plat, prepared in September 1936, which labels the meander line delineated on the dependent resurvey as the "present shore line" of Lake Bryant. The United States also relied on the draft description of the property, which states that the portion of Lot 2 to be conveyed to the United States is "LOT 2 EAST OF

17

EAST MEANDER LINE OF LAKE BRYANT," and that the description and acreage of the conveyed land was computed from the resurvey field notes. (Doc. 29-3).

However, as Nourachi correctly points out in his opposition, these documents have not been authenticated so as to be admissible in evidence, and as such, cannot be considered for summary judgment purposes. See First National Life Ins. Co. v. California Pacific Life Ins. Co., 876 F.2d 877, 881 (11th Cir. 1989) (denying summary judgment where submitted documents were not authenticated by an affidavit that meets the requirements of Fed. R. Civ. P. 56(e)).

The United States has not presented any other admissible evidence relevant to determining the intent of the parties at the time of the 1937 conveyance. The remaining evidence concerning the boundaries of the property consists of present-day fact and expert witness testimony interpreting the legal description of the conveyed property in the 1937 deed in two very different ways. Indeed, the Forest Ranger who first realized that there was a dispute over the land opined that the legal description contained in the 1937 deed was confusing, that "no one source is clear," and that only by reviewing numerous other documents was it "somewhat clear" that the United States owned the land.[20] This evidence further supports the fact that the deed itself is ambiguous.

Given the ambiguities in the language of the 1937 deed, the lack of any admissible extrinsic evidence concerning the circumstances surrounding the execution of the deed,

---

[20]See Harold Shenk email to Jerri Marr, dated July 3, 2003 (Doc. 29-15).

and the conflicting present day interpretations of the deed's legal description of the property, the Court concludes that summary judgment is not warranted as to this portion of Nourachi's quiet title claim. <u>See</u> <u>Kilfoyle v. Wright</u>, 300 F.2d 626 (5th Cir. 1962) (reversing grant of summary judgment in mining rights dispute where deed was ambiguous on its face because it contained four different methods of describing the conveyed property); <u>Zwakhals v. Senft</u>, 206 So. 2d 62 (Fla. 4th DCA 1968) (reversing grant of summary judgment where plaintiffs' deed contained ambiguous and conflicting descriptions of property that potentially overlapped with defendants' property).[21]

## II.    The Marketable Record Title Act

In the event the Court determines that the 1937 deed conveyed to the United States the property Nourachi purchased at the December 2002 tax sale, Nourachi alternatively argues that title should be divested from the United States pursuant to Florida's Marketable Record Title Act, Fla. Stat. § 712.01, *et seq.* ("MRTA").

The MRTA provides that any person vested with any estate in land of record for thirty years or more shall have a marketable record title free and clear of all claims of an interest in land. Fla. Stat. § 712.02. Section 712.03 of the Act contains several exceptions to this provision, including "estates, interests, claims, or charges, or any convenant or restriction,

---

[21]Because the Court finds that the 1937 deed is ambiguous on its face, it is not necessary to address the United States' arguments that it owns the land sold to Nourachi due to its riparian rights and accretion. This is not to say that such arguments are without merit, but rather that it would be placing the proverbial cart before the horse to determine if accretion has occurred, without first conclusively determining whether the United States' property ran up to Lake Bryant's original shore line.

preserved by the filing of a proper notice in accordance with the provisions hereof." Fla. Stat. § 712.03(2). Section 712.05 provides that a claim to interest in land can avoid extinguishment under the Act by filing a notice, in writing, preserving its claim, within the 30 year period running from the date the person first came into possession of the interest. Nourachi argues that because the United States never filed any notice preserving its claim to the property near Lake Bryant, the United States' interest was extinguished, and Nourachi may obtain title clear and free.[22]

This argument fails as a matter of law, because the MRTA, a state statute, cannot divest the United States of its property rights. <u>Chicago Title Ins. Co. v. Florida Inland Navigation District</u>, 635 So. 2d 104, 105 (Fla. 4th DCA 1994). To hold otherwise would violate Article IV, Section 3, clause 2, of the United States Constitution giving Congress the power to legislate disposition of property of the United States. <u>Id.</u> As the United States Supreme Court stated in <u>Utah Power & Light Co. v. United States</u>, 243 U.S. 404 (1917)

> Not only does the Constitution (art. 4, § 3, cl. 2) commit to Congress the power 'to dispose of and make all needful rules and regulations respecting' the lands of the United States, the settled course of legislation, congressional and state, and repeated decisions of this court, have gone upon the theory that

---

[22]Nourachi also argues that the United States' claim "should not be considered actual ownership, but rather an argument that the scope of the 1937 deed should include an additional conveyance of property greater than that stated on the face of the deed," (Doc. 36, p. 11). This argument both misconstrues the United States' argument, and renders any reliance on MRTA moot. The Act operates to divest persons of title to property when those persons fail to preserve their claims to the property over time. Thus, in order for the MRTA to operate in this case, the United States would have to have a claim to an interest in the property that it failed to preserve. If the United States is merely arguing for an expansion of the language in the 1937 deed, the MRTA would not, by its terms, apply.

the power of Congress is exclusive, and that only through its exercise in some form can rights in lands belonging to the United States be acquired. True, for many purposes a state has civil and criminal jurisdiction over lands within its limits belonging to the United States, but this jurisdiction does not extend to any matter that is not consistent with full power in the United States to protect its lands, to control their use, and to prescribe in what manner others may require rights in them.

Id. at 404. See also Royal Indemnity Co. v. United States, 313 U.S. 289, 294 (1941)

("Power to release or otherwise dispose of the rights and property of the United States is

lodged in the Congress by the Constitution.").[23]

Accordingly, summary judgment shall be granted as to this portion of Nourachi's

quiet title claim. In the event the United States is found to be the true and correct owner

of the property at issue in this case, the Florida Marketable Record Title Act cannot and will

not divest the United States of its ownership rights.[24]

## Conclusion

---

[23]It also bears noting that Nourachi has not provided any decisional or other authority for his position that the MRTA should apply to the United States. All of the cases cited focus on state or municipal government entities, to which the MRTA clearly applies.

[24]Under this same analysis, the Court concludes that any attempt by Nourachi to rely on the tax sale as proof that the United States has lost title to the property is without merit. Not only is it undisputed that the United States never received notice of the sale, but if a state statute cannot divest the United States of its property interests, surely the actions of a local government would be equally unenforceable. Moreover, federal lands are not subject to ad valorem taxes in Florida, see Fla. Stat. § 196.199. Therefore, any property owned by the United States could not be sold at a tax sale to satisfy delinquent ad valorem taxes.

Accordingly, upon due consideration, it is hereby ORDERED that the Defendant United States of America's Motion for Summary Judgment (Doc. 28) is GRANTED IN PART AND DENIED IN PART. Summary judgment is granted in favor of the United States of America and against the Plaintiff, David Nourachi, as Trustee, as to that portion of the Plaintiff's quiet title claim set forth in Count I of his Revised Amended Complaint (Doc. 18), which relies upon Florida's Marketable Record Title Act, Fla. Stat. § 712.01, *et seq*. In all other respects, the Defendant's Motion is DENIED. The Plaintiff may go forward with the remaining portion of his quiet title action, as well as his claims against Defendants Marion County and the Marion County Property Appraiser.

IT IS SO ORDERED.

DONE and ORDERED at Ocala, Florida this 23rd day of April, 2009.

_____

UNITED STATES DISTRICT JUDGE

Copies to: Counsel of Record